### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 3:18-cr-0022-4(VLB)** |
| | : | |
| **TORRENCE GAMBLE** | : | |
| **Defendant.** | : | **April 23, 2020** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

### MEMORANDUM OF DECISION DENYING DEFENDANT'S MOTION FOR A REDUCTION OF SENTENCE [Dkt. 789]

Before the Court is Defendant Torrence Gamble's Emergency Motion for a Modification of Sentence pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). [Dkt. 789]. Defendant seeks a modification of his sentence from incarceration to home confinement based on his risk of complications should he contract COVID-19 while incarcerated at MDC Brooklyn. The Government opposes Defendant's motion. [Dkt. 792].  For reasons set forth below, the Court DENIES Defendant's motion.

### Background

On December 18, 2019, the Court sentenced Mr. Gamble to 92 months of incarceration following Defendant's guilty plea to one count of Conspiracy to Distribute, and to Possess with Intent to Distribute, cocaine base, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B). Mr. Gamble was one of nineteen defendants arrested following an FBI investigation into a crack cocaine trafficking operation in

1

a residential area in New Haven, Connecticut. [Dkt. 684 (Pre-Sentence Investigation Report) ¶¶ 6-9](hereinafter PSR).[1] Mr. Gamble acted as a supplier to street level dealers and redistributors in the lead defendant's absence. [PSR ¶8]. Mr. Gamble's unlawful activities in furtherance of the conspiracy resulted in an attributed drug quantity guideline calculation of between 112 and 196 grams of crack cocaine. [PSR ¶¶ 6-9].

Mr. Gamble's *extensive* criminal history placed him in Category VI, the highest criminal history category under the U.S. Sentencing Commission Guidelines. During his pre-sentence interview with the probation office, Mr. Gamble was cavalier about his recent conviction for criminal possession of a firearm, stating "I've held guns, played with guns, shot guns, been shot at and shot at people. Growing up in the hood I had to follow the trend. It was either get killed or kill something … I don't feel bad about it." [PSR ¶ 53].

In addition to the prior firearm charge, Mr. Gamble has multiple prior convictions for drug sales, failure to appear, escape, and running from the police. [PSR ¶¶ 29-42].

The parties, the probation office, and the Court all agreed on the Defendant's advisory guideline range based on an adjusted offense level of 23 and criminal history category VI: 92-115 months of incarceration. [12/18/2020 sent. hearing at

---

[1] At sentencing, the Court confirmed that Defendant read the presentence report ("PSR"). Defendant did not have any objections to the facts as presented in the PSR and the Court adopted the PSR as its finding of fact. [12/18/2020 sent. hearing at 14:06:03-14:06:50].

14:05:18-14:06:59]. At sentencing, the Court addressed, *inter alia*, the need to protect the public and deter Mr. Gamble from future criminal conduct given his criminal history, which was unabated by a prior ten-year prison sentence. [*Id.* at 15:18:39-15:21:46]. The Court noted that Mr. Gamble's medical conditions were being treated with medication and none of these conditions were beyond the capability of the Bureau of Prisons to address. [*Id.* at 15:21:46-15:22:02].

<u>**Legal Standard**</u>

The First Step Act of 2018 amended the procedural requirements for bringing a motion to reduce sentence to provide compassionate release. 18 U.S.C. § 3582(c)(1)(A). Because of this amendment, a defendant may move for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Previously, only the Bureau of Prisons ("BOP") could move for compassionate release and such motions were rarely filed. *See United States v. Rivernider*, No. 3:10-CR-222(RNC), 2020 WL 597393, at *2 (D. Conn. Feb. 7, 2020). The amendment expanded access to the courts but did not alter the substantive standard. *See Ibid.*; *see also United States v. Ebbers*, No. S402CR11443VEC, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).

To consider a sentence reduction for compassionate release, Defendant must show that "extraordinary and compelling reasons warrant such a reduction."

18 U.S.C. § 3582(c)(1)(A)(i). By statute, such reduction must be consistent with applicable policy statements issued by the U.S. Sentencing Commission. § 3582(c)(1)(A). In addition to finding "extraordinary and compelling" reasons for the reduction, the Court must also find that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)" per U.S.S.G. 1B1.13(2). Then, before compassionate release can be granted, the Court must consider the 18 U.S.C. § 3553 sentencing factors to the extent relevant. *Ibid.*

At Congress's direction, the U.S. Sentencing Commission promulgated guidance on the circumstances constituting "extraordinary and compelling" reasons. *See* 28 U.S.C. § 944(t). As other courts have recognized, the U.S. Sentencing Commission guidance has not yet been updated to reflect the liberalization of the procedural requirements. *Ebbers*, 2020 WL 91399, at *4. The Application Notes to U.S.S.G. § 1B1.13 explain that a defendant's medical condition may constitute "extraordinary and compelling" circumstances when:

(A) Medical Condition of the Defendant.--
  (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.> [or]
  (ii) The defendant is--
       (I) suffering from a serious physical or medical condition,
       (II) suffering from a serious functional or cognitive impairment, or
       (III) experiencing deteriorating physical or mental health because of the aging process,
  that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

4

**U.S.S.G. 1B1.13, Commentary Application Note 1(A)**

Commentary Application Note 1(D) contains a residual clause to provide relief for other "extraordinary and compelling reasons" as determined by the Director of the Bureau of Prisons.

The Defendant bears the burden of showing that he is entitled to a sentence reduction. *Ebbers*, 2020 WL 91399, at *4.

<u>Analysis</u>

**I.      <u>Exhaustion requirement</u>**

By the plain and unambiguous language of 18 U.S.C. § 3582(c)(1)(A), a defendant must first seek administrative relief, and then may only proceed to court after fully exhausting administrative appeals or the lapse of 30 days from the warden's receipt of the request, whichever is earlier.

Here, Mr. Gamble did not satisfy the statute's administrative exhaustion requirement. According to his motion, he first requested compassionate release from the warden of Metropolitan Detention Center Brooklyn on March 30, 2020, which remains pending. [Dkt. 789 (Def. Mem. to Reduce Sent.) at 2]. Mr. Gamble argues that his failure to exhaust administrative remedies is excused on account of exigent circumstances created by the COVID-19 public health emergency. The Court disagrees.

The Second Circuit has not yet addressed whether the administrative exhaustion requirement under § 3582(c)(1)(A) can be excused and, if so, under what conditions. Several courts addressing motions for compassionate release related to the COVID-19 pandemic have found that, under certain conditions, a defendant's failure to fully exhaust administrative remedies was excused. *See, e.g. United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at \*2 (S.D.N.Y. Apr. 1, 2020); *United States v. Colvin*, No. 19 Cr. 179, 2020 WL 1613943, at \*2 (D. Conn. Apr. 2, 2020); *United States v. Zuckerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at \*2 (S.D.N.Y. Apr. 3, 2020). Other courts have approached the authority to grant compassionate release absent administrative exhaustion with skepticism given Congress's intent to have the BOP evaluate the defendant's request first. *See United States v. Gross*, No. 15-CR-769 (AJN), 2020 WL 1673244, at \*3 (S.D.N.Y. Apr. 6, 2020); *see also United States v. Woodson*, No. 18-CR-845 (PKC), 2020 WL 1673253, at \*4 (S.D.N.Y. Apr. 6, 2020)(citing additional cases in this Circuit addressing the split in opinion); *United States v. Tyreek Ogarro*, No. 18-CR-373-9 (RJS), 2020 WL 1876300, at \*3-4 (S.D.N.Y. Apr. 14, 2020)(Sullivan, J sitting by designation)(same).

"While the "[c]ommon law (or 'judicial') exhaustion doctrine ... recognizes judicial discretion to employ a broad array of exceptions that allow a plaintiff to bring his case in district court despite his abandonment of the administrative review process," this array of exceptions—including futility—is simply not available when the exhaustion requirement is statutory." *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004) (quoting *Beharry v. Ashcroft*, 329 F.3d 51, 58 (2d

Cir. 2003), as amended (July 24, 2003)). But even this seemingly absolute standard is subject to narrow exception. *See Booth v. Churner*, 532 U.S. 731, 736, n.4 (2001) ("Without the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust.").

As Judge Castel explained in *Woodson*, the cases finding that the administrative exhaustion requirement is waivable have relied on the standard from *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), which sets forth the three exceptions to judicially-imposed exhaustion requirements from *McCarthy v. Madigan*, 503 U.S. 140, 146-50 (1992), not the stricter standard for statutorily imposed exhaustion requirements. *Woodson*, 2020 WL 1673253, at *4; *Ogarro*, 2020 WL 1876300, at *3-4 (same).

Moreover, the administrative exhaustion requirement for compassionate release motions serves important policy functions. The BOP is often in the best position to evaluate the scope of an inmate's medical condition, the adequacy of the release plan, and any danger posed to the community if they are released. *Gross*, 2020 WL 1673244, at *2 (citation omitted). The BOP also knows, which the Court does not, the actual conditions of confinement, containment and protective measures being taken.  It is also in a superior position to know the true risks and effects of infection as opposed to the theoretical risks and effects. "If the BOP denies a defendant's application, the BOP's decision may inform the Court of why the agency does not consider the relief warranted. The present national health emergency makes thoughtful and considered input from the BOP all the more

7

valuable in avoiding unwarranted disparities among convicted defendants." *Woodson*, 2020 WL 1673253, at *3.

Additionally, the passage of the CARES Act further demonstrates Congress's recognition of the risk of viral transmission posed to inmates and that Congress sought action from the executive branch and not "piecemeal consideration by the courts." *Ogarro*, 2020 WL 1876300, at *5. Congress could have amended the statutory exhaustion requirement, but instead authorized the Director of the BOP to lengthen the maximum amount of time to place a prisoner in home confinement under 18 U.S.C. § 3624(c)(2), upon authorization from the U.S. Attorney General. See CARES Act, PL 116-136, 134 Stat 281, § 12003(b) (Mar. 27, 2020).

The Defendant does not present the "unique circumstances" found to warrant excusal of the exhaustion requirement by the Southern District of New York in *Perez*, 2020 WL 1546422, at *2 or by this District in *Colvin*, 2020 WL 1613943, at *2. In *Perez*, the defendant had less than three weeks remaining on his sentence, thus, "pursuing the administrative process would be a futile endeavor; he is unlikely to receive a final decision from the BOP, and certainly will not see 30 days lapse before his release date." *Id.* at 5. Similarly, in *Colvin*, 2020 WL 1613943, at *2, the Defendant only had eleven days remaining on her sentence, meaning that her sentence would have likely ended before her appeal could be heard or the 30-day period expired. By contrast, defendant has over five years of incarceration remaining on his sentence.

Defendant's argument that the administrative exhaustion requirement under § 3582(c)(1)(A) is analogous to *Conn. State Dep't of Soc. Servs. v. Thompson*, 242 F. Supp. 2d 127, 139 (D. Conn. 2002) also fails. [Dkt. 789 (Def. Mot. to Reduce Sent.) at 8]. First, *Thompson* concerned the procedures used by a financial intermediary to evaluate Medicare reimbursement claims submitted on behalf of dual Medicare-Medicaid enrollees. *Connecticut Dep't of Soc. Servs. v. Leavitt*, 428 F.3d 138, 142 (2d Cir. 2005)(reversing judgment in *Conn. State Dep't of Soc. Servs. v. Thompson*, 242 F. Supp. 2d 127 (D. Conn. 2002)). Compared to complex Medicare reimbursement rules, Mr. Gamble need only wait 30 days upon the warden's receipt of his request to have fully exhausted his administrative remedies, and perhaps less time if the appeal process concludes within thirty days. Effectively, the thirty-day period operates as a safeguard against unconscionable agency delay. Second, unlike *Thompson*, the nature of Mr. Gamble's administrative request is not the denial of procedural due process by that agency. *See Bowen v. City of New York*, 476 U.S. 467, 484 (1986). Rather, Mr. Gamble claims that the relief he should have received in the first place is his release from custody.

For reasons discussed below, he fails to establish that "extraordinary and compelling" reasons warrant his release, even had the exhaustion requirements been satisfied.

## II. Whether Extraordinary and Compelling Reasons Exist

Defendant's motion fails on the merits because Defendant's medical condition does not present "extraordinary and compelling" reasons for his release.

First, Mr. Gamble's condition does not satisfy the medical severity standards set forth in the application notes to U.S.S.G. 1B1.13. He is neither terminally ill nor incapable of rendering self-care in a custodial setting.

This Court recognizes that "extraordinary and compelling" circumstances may exist outside of those circumstances delineated by the U.S. Sentencing Commission, given the advisory nature of the guidelines, *United States v. Booker*, 543 U.S. 220 (2005), and their conflict with the statutory language of the First Step Act amendments. *United States v. Anton Jepsen*, No. 3:19-CV-00073(VLB), 2020 WL 1640232, at *4 (D. Conn. Apr. 1, 2020). The guidelines are nevertheless helpful in defining the vague standard because the First Step Act did not amend the substantive standard. *Ebbers*, 2020 WL 91399, at *4.

Here, Mr. Gamble has not shown he is in an appreciably greater risk of life-threatening complications if he contracts COVID-19.  As the Defendant's exhibit shows [Dkt. 789, Ex. 1], the U.S. Centers for Disease Control and Prevention identified diabetics, particularly those with uncontrolled diabetes, as having an increased risk if they contract COVID-19. U.S. Centers for Disease Control and Prevention, COVID-19, *People who are at a higher risk for severe illness*, (last reviewed Mar. 22, 2020)("People of any age with severe obesity (body mass index [BMIJ >40] or certain underlying medical conditions, particularly if not well controlled, such as those with diabetes, renal failure, or liver disease might also be at risk.")

The American Diabetes Association states that if a diabetic contracts COVID-19 they should monitor and maintain a healthy blood sugar level. Am. Diabetes Ass'n., *COVID-19: If you do get sick, know what to do,* *https://www.diabetes.org/blog/coronavirus-covid-19-know-what-to-do.* Mr. Gamble's diabetes was controlled by medication at the time of sentencing. [PSR ¶ 59]. He presents no claim or supporting evidence that his diabetes is not being– and if it is not cannot be– controlled by medication currently. *Compare to Jepsen*, 2020 WL 1640232 at 5 ("Mr. Jepsen is in the unique position of having less than eight weeks left to serve on his sentence, he is immunocompromised and suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19, and the Government consents to his release.") Mr. Jepsen is also distinguishable because his compromised condition markedly reduces the risk his release poses to the public.  In addition, as discussed below, Mr. Jepsen's conduct does not suggest he would pose a risk of lethal danger to the community like Mr. Gamble.

Mr. Gamble's motion states that his counsel was informed by the Federal Defenders of New York that the BOP classified him as "high risk" for COVID-19, which defendant presumes was because of his diabetes. [Dkt. 789 (Def. Mot. to Reduce Sent.) at 2]. This information tends to show that the BOP is taking proactive measures to identify at-risk inmates and reduce the infectivity of the virus.

Mr. Gamble's motion does not discuss what steps the BOP has undertaken to reduce his risk of contracting the illness at MDC Brooklyn now that he is classified as "high risk" and how these steps are inadequate as applied to his current medical

condition. *See* Fed. Bureau of Prisons, COVID-19 Action Plan: Phase V, Eff. 04/01/2020, available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last updated Mar. 31, 2020).

Moreover, the dire predictions upon which Mr. Gamble relies have not come to fruition and are not borne out by empirical evidence. At present, there is only one confirmed inmate case and 23 staff member cases at MDC Brooklyn, none of which have resulted in fatalities. Fed. Bureau of Prisons, COVID-19 Cases, https://www.bop.gov/coronavirus/ (last updated on Apr. 23, 2020). Defendant's reply brief cites the rise in the infection rate of prisoners in BOP custody as compared to the general U.S. population. [Dkt. 795 (Def. Repl. Br.) at 8]. But altering the reference class shows a very different picture.

To date, 24 inmates out of 153,776 or .015 % (i.e. 1.5 per 10,000) of the population held in Bureau of Prison managed facilities or community-based facilities died from COVID-19 and 540 or .35% have become infected. *See* Fed. Bureau of Prisons, *BOP COVID-19 Cases (Table)*, https://www.bop.gov/coronavirus/index.jsp, (last updated 04/22/2020). By comparison, the state of Connecticut has had 22,469 laboratory confirmed COVID-19 positive infections and 1,544 deaths. Conn. Dep't. of Pub. Health, *Coronavirus Disease 2019 (COVID-19)*, https://portal.ct.gov/coronavirus (last reviewed Apr. 22, 2020). Consequently, Connecticut's infection rate is 71% higher than the BOP's and its death rate is close to double the BOP's by population. (calculated using Conn. Dep't. Pub. Health, *Annual Town and County Population for Connecticut-2018*, https://portal.ct.gov/DPH/Health-Information-Systems--

Reporting/Population/Annual-Town-and-County-Population-for-Connecticut).[2]  Mr. Gamble has not shown that releasing him will reduce his risk of contracting or improve his health prospects should he contract the coronavirus and succumb to COVID-19.

Further, Defendant has not shown that the BOP cannot adequately manage the pandemic or treat Mr. Gamble. *See United States v. Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020). Rather, the BOP demonstrated its ability to contain the spread of the virus at Mr. Gamble's facility.

Mr. Gamble has not persuaded the Court that he is any worse off than the public at large in this District, much less a showing of extraordinary and compelling reasons for his release.

Mr. Gamble also poses a clear risk of lethal danger to the community.  He was cavalier and unapologetic about his illegal possession of deadly weapons.  In doing so, he made clear the fact that he would illegally possess firearms in the future, critically endangering the lives of others.

Accordingly, the Court finds that there are no "extraordinary and compelling" reasons to modify Mr. Gamble's sentence and that the public would be at grave risk should he be released.

---

[2]  The Court recognizes that these statistics are imperfect as reporting methodologies among different government agencies vary. They are cited for illustrative purposes to show that inmates in BOP custody as a whole have fared far better than the residents of this District.

### III.    Whether Defendant poses a danger to the community

In Defendant's reply brief, Defendant argues that he is a suitable candidate for home confinement and defense counsel explains his proposed living environment to the best of his ability. [Dkt. 795 (Def. Reply Br.) at 10-11]. The Court appreciates the constraints placed on defense counsel's ability to investigate Defendant's proposed home confinement plan. The Court denies Defendant's motion not because of an inadequate release plan, but because Defendant is ill suited for home confinement because of his lengthy criminal history and no conditions could adequately protect the public.

18 U.S.C. § 3142(g) requires the Court to consider, *inter alia*, the history and characteristics of the person, including:

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law;

As discussed above, aside from his numerous drug trafficking convictions, Mr. Gamble has a recent firearms conviction, for which he is unapologetic, and has previously escaped from custody and failed to appear. He had 14 prior convictions at the time of sentencing and received lengthy prison sentences in the past. [PSR ¶¶ 29-42]. Defendant is age 47 without any employment history. [PSR ¶ 66]. The Court disagrees with Defendant's argument that he could not reengage in drug

14

trafficking unless he was "free to roam." [Dkt. 795 (Def. Reply Br.) at 10]. Defendant could certainly engage in drug transactions from a dwelling.

Accordingly, the fact that Defendant remains a danger to the community, as provided in 18 U.S.C. § 3142(g), also precludes his release to home confinement, as no conditions would be adequate to safeguard the public.

§ 3553(a) factors

In addition to the Court's findings that Mr. Gamble failed to satisfy the administrative exhaustion requirements and failed to show "extraordinary and compelling" reasons to modify his sentence and would pose a danger to the public, his motion also fails when the Court considers the relevant sentencing factors. 18 U.S.C. § 3553(a).

Now, less than twenty six months into a 92-month sentence, Mr. Gamble continues to pose a danger to the public. Moreover, Defendant was undeterred by a prior 10 year sentence of incarceration, suggesting that release on home confinement after having served just over twenty five percent of his sentence would not sufficiently deter him from resuming criminal activity.

Even with the current pandemic, Mr. Gamble has not shown that his medical condition cannot be managed by the BOP. A sentence of home confinement would not reflect the seriousness of the offense or foster respect for the law.

## Conclusion

For the reasons stated above, the Court DENIES Defendant's Motion for a Reduction of Sentence.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: April 23, 2020